# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

PAUL CASTANEDA,

       Plaintiff,

v.                                        No. CIV 14-0103 RB/LAM

THE CITY OF ALBUQUERQUE,
RAY SCHULTZ, former Chief of Police,
SERGEANT DONNY KEITH, Albuquerque
Police Officer and D. HENSLEY, Albuquerque
Police Officer,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Defendants' Motion for Summary Judgment (Including Qualified Immunity) and Memorandum of Law in Support filed on August 14, 2015 (Doc. 62), and Plaintiff Paul Castaneda's Motion for Partial Summary Judgment on Count I of His Complaint: Unlawful Arrest, Unlawful Charging, Unreasonable Seizure, and Excessive Force, filed on August 14, 2015 (Doc. 64). Jurisdiction arises under 28 U.S.C. § 1331.

Having considered the submissions of counsel and relevant law, the Court will:

(1)    **DENY** Plaintiff's motion for partial summary judgment;

(2)    **GRANT** Defendants' motion on the following claims: (Count I) unlawful charging, unreasonable seizure, and excessive force in violation of the Fourth Amendment; (Count II) violation of due process rights under the Fourteenth Amendment; (Counts III and IV) violations under the Americans with Disabilities Act; (Count V) violations under the Tort Claims Act against the City of Albuquerque, Ray Schultz, and Donny Keith for negligent training and supervision, and all violations of the New Mexico

Children's Code; (Count VI) violations of Article II, Section 18 of the New Mexico Constitution; and (Count VII) municipal or supervisory liability under § 1983; and

(3) **DENY** Defendants' motion as to Plaintiff's claims regarding: (Count I) unlawful arrest in violation of the Fourth Amendment; and (Count V) battery and false imprisonment under the New Mexico Tort Claims Act, and violations under Article II, Section 10 of the New Mexico Constitution. These claims are the only ones remaining for the Court's consideration.

Because no claims remain against the City of Albuquerque, Mr. Schultz, or Sergeant Keith, these three Defendants are dismissed from the case.

I.     **Procedural Background**

On January 2, 2014, Plaintiff (Paul Castaneda) filed a complaint for damages in the Second Judicial District Court, County of Bernalillo, State of New Mexico. (Doc. 2-A, Compl. at 1.) Plaintiff, who has a diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD"), was a student at Grant Middle School in Albuquerque, New Mexico at the time of the incident described in the complaint. (*Id.* at ¶¶ 14–15; Doc. 72-2.) On December 12, 2008, Plaintiff was scheduled for an In School Suspension ("ISS"), but he asserts that due to his ADHD, he had forgotten about the ISS and reported instead to his regularly scheduled class. (Compl. at ¶¶ 16–19, 50.) Plaintiff alleges that Defendant School Resource Officer ("SRO") D. Hensley came to Plaintiff's classroom, searched Plaintiff's backpack and pockets, handcuffed Plaintiff with zip ties (causing his fingers to turn blue), and transported Plaintiff to the Juvenile Detention Center. (*Id.* at ¶¶ 20, 23–25; Doc. 72, Ex. 4 at 42–46.) Defendant Hensley charged Plaintiff with "Interference with members of staff, public officials or the general public" pursuant to N.M. Stat. Ann. § 30-20-13(D) (1978). (Compl. at ¶ 26.)

Plaintiff filed his complaint in state court alleging (1) unreasonable seizure and excessive force, arrest, and charging in violation of his Fourth Amendment rights; (2) a deprivation of his liberty interest in violation of his substantive due process rights under the Fourteenth Amendment; (3) a violation of the Americans with Disabilities Act ("ADA") in arresting and charging him with a delinquent act for the manifestations of his disability; (4) a violation of the ADA in the lack of accommodation of his disability; (5) battery and false imprisonment under the Tort Claims Act and in violation of Article 2, Section 10 of the New Mexico Constitution; (6) violations of his rights under Article 2, Section 18 of the New Mexico Constitution; and (7) negligent training and supervision of Defendant Hensley by Defendant Ray Schultz and Defendant Donny Keith. (*Id.* at ¶¶ 30–83.)

Defendants filed their Motion for Summary Judgment (Including Qualified Immunity) (Doc. 62) and a Motion to Stay Proceedings Until Such Time as the Court Decides Pending Motion for Qualified Immunity (Doc. 63) on August 14, 2015. Plaintiff filed a response to the motion for summary judgment on September 11, 2015 (Doc. 72), and Defendants filed a reply on October 2, 2015 (Doc. 76). The Court granted Defendants' motion to stay on December 23, 2015. (Doc. 87.) Plaintiff also filed a Motion for Partial Summary Judgment on Count I of His Complaint: Unlawful Arrest, Unlawful Charging, Unreasonable Seizure, and Excessive Force on August 14, 2015. (Doc. 64.) Defendants filed a response to Plaintiff's motion on September 9, 2015 (Doc. 69), and Plaintiff filed his reply on October 5, 2015 (Doc. 78).

## II.    Statement of Facts

On the day of the incident at issue in this case—December 12, 2008—Plaintiff was a 13-year-old student at Grant Middle School. (Compl. at ¶¶ 2–3.) On that date, Defendant Hensley worked as a police officer for the Albuquerque Police Department and served as the School

Resource Officer for Grant Middle School, Defendant Schultz was Chief of the Albuquerque Police Department, and Defendant Keith was a Sergeant working for the Albuquerque Police Department. (*Id.* at ¶¶ 6–8.) Prior to the incident, Plaintiff had been diagnosed with and prescribed medication for ADHD. (*Id.* at ¶ 2; Doc. 72-2 at 1.) Plaintiff had been treated by a physician and took medication for his ADHD earlier in 2008, but Plaintiff's mother (Ms. Linda Castaneda) testified that she believed he had stopped taking his medication prior to December 12, 2008. (Doc. 62-E, Linda Castaneda Dep. 87:22–88:6.) Plaintiff testified that the last time he saw a physician, psychologist, or other specialist for ADHD or learning disabilities was in his eighth grade year, at the time of his last medication refill.[1] (Doc. 62-B, Paul Castaneda Dep. 12:10–22.)[2]

Plaintiff testified that one of the symptoms of his ADHD is forgetfulness. (Doc. 72-4, Paul Castaneda Dep. 77:19–21.) Dr. Donald Flammer noted in a Psychiatric Diagnostic Examination on March 27, 2008 that "[a]t school, [Plaintiff] has poor memory" and other "symptoms of attention deficit hyperactivity disorder, which hinder his ability to maintain task persistence [and] to complete and practice basic academic skills in an age appropriate manner." (Doc. 72-2 at 1–2.) Grant Middle School administration was aware of Plaintiff's diagnosis and that he required certain accommodations. (*See* Doc. 72-1.) Plaintiff's Individual Education Plan ("IEP"), dated April 24, 2009, listed one of his necessary "[a]ccommodation[s] of instruction" as "[c]hecking for understanding"; a necessary "[p]resentation of instruction" as "repeated

---

[1] Plaintiff was unsure about the exact date he last refilled his prescription. He testified that it was in eighth grade, but when the questioning attorney suggested it might have been 2009, Plaintiff responded, "I can't really recall. It was a long time ago, but from what I'm thinking, adding up, yes." (Doc 72-4, Paul Castaneda Dep. 12:2–15.) Ms. Castaneda, however, testified that she believed he stopped taking his medication prior to the incident. (Doc. 62-E, Linda Castaneda Dep. 87:22–88:6.)

[2] References to the Paul Castaneda Dep. refer to the deposition attached to Defendants' motion, Doc. 62-B, unless the parenthetical citation specifically references Plaintiff's deposition attached to Plaintiff's response, Doc. 72-4. References to the Hensley Dep. refer to the deposition attached to Defendants' motion, Doc. 62-A, unless the parenthetical citation specifically references Hensley's deposition attached to Plaintiff's motion, Doc. 64-2.

instructions"; and a "[b]ehavior management" accommodation of "[f]requent reminder of rules." (*Id.* at 1.) Defendant Hensley testified that he does not believe he had any contact with Plaintiff prior to December 12, 2008, nor is there evidence in the record to show that Defendant Hensley was aware of Plaintiff's IEP or the necessary accommodations for that disability. (Doc. 62-A, Hensley Dep. 33:10–15, 50:21–51:11.)

Sometime in September 2008, the principal of Grant Middle School gave Plaintiff a referral to attend ISS on December 12, 2008. (Paul Castaneda Dep. 35:2–14.) The administration of Grant Middle School used ISS as a tool to deal with students' behavior problems. (Hensley Dep. 36:18–37:3; Doc. 62-C at 3.) Plaintiff testified that in his experience, he normally received an ISS referral date that was within two to three days of a behavioral infraction. (Paul Castaneda Dep. 53:2–6.) This time, however, Plaintiff's ISS referral was scheduled for a date approximately two months after his behavioral infraction. (*Id.* at 35:2–14.) Ms. Barbara Tate served as an educational assistant at Grant Middle School. (Doc. 62-D, Tate Dep. 16:9–11.) Ms. Tate supervised the ISS classroom on December 12, 2008. (Hensley Dep. 34:14–18; Doc. 62-C at 3.) Ms. Tate asserts she did not have access to Plaintiff's IEP. (Tate Dep. 16:18–17:14.)

Ms. Tate testified that at the time of the incident, the ISS referral process worked in this way: when a student misbehaved, the student's teacher wrote an ISS referral and sent the student to the administrative office where the principal decided on a consequence. (*Id.* at 6:16–24.) If the consequence was time in ISS, the student took the referral to the secretary who filled out a triplicate form with the date of the ISS. (*Id.* at 6:23–7:8.) The secretary gave one copy to the student; the student took it home for a parent's signature and brought it back.[3] (*Id.* at 7:4–12.)

---

[3] Plaintiff testified that he does not recall receiving a copy of the ISS referral form, but he does recall signing a form when he received the ISS referral in September 2008. (Doc. 72-4, Paul Castaneda Dep. 76:25–77:5.)

Ms. Tate testified that school staff routinely notified students who had ISS referrals for the day by placing a copy of the students' names on the outside window where students would see it as they entered school each morning. (*Id.* at 7:13–17.) School staff also posted a copy of the students' names by the school's office. (*Id.* at 7:18–19.) If a student with an ISS referral failed to report to the ISS classroom, Ms. Tate testified that her practice was to check to see if the student was absent from school. (*Id.* at 7:21–8:6.) If the student was present at school but had failed to report to ISS, Ms. Tate would track the student down. (*Id.* at 8:6–7.)

Plaintiff, who had spent time in ISS prior to the date of the incident, testified that he recalls the school—typically the principal or a secretary—gave students oral notice of ISS assignments before the first class period. (Paul Castaneda Dep. 32:20–33:3.) Plaintiff asserts he did not receive any oral notice prior to his first class on the date of the incident. (*Id.* at 33:4–5.) Plaintiff testified that because he did not receive an oral reminder, he had no recollection of the referral. (*Id.* at 37:12–17.) Plaintiff also testified that he had served a Saturday school—an alternative disciplinary program at Grant Middle School—the weekend prior to December 12, 2008. (*Id.* at 54:3–25.) Plaintiff testified that he believed he served the Saturday school as an alternative to the December 12, 2008 ISS referral. (*Id.*) Plaintiff contends that during the Saturday school, the principal of Grant Middle School told Plaintiff that he did not need to attend ISS on December 12, 2008. (*Id.* at 54:9–14.) Contrary to his earlier testimony that he did not have any recollection of the ISS referral, Plaintiff also testified that because he was under the impression the principal had cleared the ISS referral for December 12, 2008, he "blew it all off, like didn't know about it . . . ." (*Id.* at 54:17–25.) And so although he was scheduled to spend the day in ISS, Plaintiff did not report to the ISS classroom on December 12, 2008. (Doc. 62-C at 3.)

6

Defendant Hensley testified that it was his practice to check into the ISS classroom every morning, and he contends he did so on the morning of the incident. (Hensley Dep. 45:15–46:4.) In the report he wrote after the incident, Officer Hensley stated that Ms. Tate informed him she had several students who failed to appear for ISS that morning. (Doc. 62-C at 3.) Hensley testified at his deposition (but did not include in his written report) that when he checked into the ISS classroom that morning, Ms. Tate had already sent a student aide to Plaintiff's classroom to collect Plaintiff. (Hensley Dep. 44:10–47:11.) Defendant Hensley contends Ms. Tate informed him that Plaintiff refused to accompany the student aide to the ISS classroom. (*Id.* at 47:12–21.)

Defendant Hensley testified that the ISS system had become backlogged that year due to students refusing to attend their scheduled ISS dates. (*Id.* at 38:13–40:18, 43:8–24.) Defendant Hensley testified that the school administration would give students who refused to attend ISS a new ISS referral, possibly with additional ISS time added to the referral for their refusal. (*Id.* at 40:4–12.) Ms. Tate also testified that when students failed to appear in the ISS classroom, the principal primarily assigned additional time in ISS as punishment. (Tate Dep. 8:22–9:23.) Defendant Hensley testified that the students' refusals to attend ISS affected Ms. Tate, the ISS classroom, the overall function of the front office, and all of the teachers who used ISS as a disciplinary tool. (Hensley Dep. 41:2–43:24.)

On December 12, 2008, Plaintiff arrived at school before the first bell, ate breakfast, and then went to his first period guitar class. (Paul Castaneda Dep. 32:22–33:5.) Contrary to Defendant Hensley's testimony, Plaintiff testified he has no recollection that a student aide ever came to his classroom that morning before Defendant Hensley arrived. (*Id.* at 37:5–17.) Defendant Hensley testified that after he spoke to Ms. Tate, he went to Plaintiff's regular class, located Plaintiff, and took Plaintiff to his office. (Hensley Dep. 47:3–50:20.) Plaintiff asserts that

when Officer Hensley came to his classroom that morning, Plaintiff gathered his belongings and volunteered to go to ISS right then. (Paul Castaneda Dep. 33:6–18.) Plaintiff testified that after he volunteered to go to ISS, Officer Hensley replied, "no, you need to come to my office." (*Id.* at 33:19–20.) Conversely, Defendant Hensley asserts that Plaintiff never said anything to him except that he did not have ISS. (Hensley Dep. 50:6–8.)

Ms. Judy Jones, the teacher in Plaintiff's classroom, wrote an email a week after the incident at Plaintiff's mother's request to advocate for Plaintiff. (Doc. 72-7.) Ms. Jones wrote that she accepted partial responsibility for his failure to attend ISS, as she had seen his name on the office-produced list. (*Id.*) She went on, "[w]hen he came in to class, I forgot that he was not supposed to be there. Had I remembered, I would have told him to go, [and] he would have gone . . . ." (*Id.*) Ms. Jones also wrote that she told Defendant Hensley that Plaintiff "may very well have forgotten to go to ISS, since that is his disability." (*Id.*) Conversely, Defendant Hensley testified that he did not have any conversation with Plaintiff's teacher. (Hensley Dep. 49:2–13.) Ms. Tate testified that the majority of students who had to be tracked down for failing to report to ISS claimed they had forgotten about their ISS referral. (Tate Dep. 15:1–21.) This assertion was reflected in Defendant Hensley's report made directly after the incident. (Doc. 62-C at 3 ("Ms. Tate said it is typical for students to report to other classes and claim they were not aware of their ISS date.").)

Defendant Hensley brought Plaintiff to his office and had him wait there for six to seven minutes while he retrieved another student; Hensley had information that the second student also had refused to accompany the student aide to the ISS classroom and had cursed at the aide. (Hensley Dep. 48:6–18, 49:14–20; Paul Castaneda Dep. 33:20–24.) At some point between retrieving Plaintiff and transporting him to the Juvenile Detention Center ("JDC"), Hensley

8

searched Plaintiff's backpack, asked Plaintiff to empty his pockets, and handcuffed Plaintiff using flex cuffs. (Hensley Dep. 51:16–52:16, 57:20–22; *see also* Paul Castaneda Dep. 43:18–24.) Defendant Hensley testified that he left a couple fingers' space between Plaintiff's wrists and the cuffs. (Hensley Dep. 57:25–58:4.) Plaintiff was never combative, and Defendant Hensley testified he had no reason to believe that Plaintiff would have acted violently. (*Id.* at 58:8–14.)

Eventually, Defendant Hensley placed Plaintiff and the other student under arrest for interfering with the educational process in violation of N.M. Stat. Ann. § 30-20-13(D). (*Id.* at 50:1–8.) Mike Archibeque, Defendant Hensley's supervisor, reviewed and approved Defendant Hensley's police report and the decision to arrest Plaintiff. (*Id.* at 60:18–61:20.) Defendant Hensley then transported Plaintiff to the JDC. (*Id.* at 58:20–59:24, 60:18–61:20.)

Defendant Hensley testified that when an officer arrests a child, the officer has the option of either faxing a copy of the police report to the Juvenile Probation Office, or taking the child directly to the JDC. (Doc. 64-2, Hensley Dep. 17:19–24.) Plaintiff submitted the deposition of Martha Todd, a juvenile probation officer with the Juvenile Probation Office. (Doc. 64-6, Todd Dep. 4:19–21.) Plaintiff's counsel, Mr. Kennedy, obtained Ms. Todd's deposition for another case he litigated regarding the arrest of a student—*J.H. ex rel. J.P. v. White*, D-202-CV-2013-07803. Todd testified that after an officer has faxed the police report and/or taken the child to the JDC, a member of the Juvenile Probation Office completes a preliminary inquiry and decides whether to send it to the children's court attorney. (Todd Dep. 7:12–8:7.) The children's court attorney then decides whether to officially file charges against the minor. (*Id.*)

Staff from the JDC cut the flex cuffs from Plaintiff's wrists at some point after he arrived and placed Plaintiff in a holding cell. (Paul Castaneda Dep. 46:2–23.) Plaintiff testified that when the staff cut the flex cuffs off of his wrists, his hands and/or wrists were blue and had

indentations for up to 45 minutes, but then they were fine. (*Id.* at 42:4–17; 47:15–20; Doc. 64-4, Paul Castaneda Dep. 79:22–80:13.) Plaintiff asked the nurse at the JDC, "is this bad?," and she said "[n]o, it will be fine. Just let it breathe for a minute." (Paul Castaneda Dep. 47:12–18.) Plaintiff never asked Defendant Hensley to loosen the flex cuffs because Plaintiff knew that flex cuffs could not be loosened, and because he "didn't want any trouble." (*Id.* at 42:18–43:9.) Plaintiff's father picked him up from the JDC around 4:00 that afternoon. (*Id.* at 49:6–9.)

Plaintiff testified that the experience scared him, and that he "shed a tear in the holding cell" at the JDC. (*Id.* at 55:9–18.) Plaintiff was arrested on a Friday, but he did not go to school on the following Monday because he felt depressed about the incident. (*Id.* at 51:2–23, 55:5–56:3.) After the incident, Ms. Castaneda testified that she noticed a change in Plaintiff's behavior: e.g., he started slamming doors, he punched a hole in a wall, he wrote all over his walls (including "I didn't do it" and "it's not my fault"), he became disrespectful at home, he cursed at her, he said that he belonged in jail, he said "I give up." (Doc. 72-8, Linda Castaneda Dep. 77:13–78:7.) Ms. Castaneda testified that this behavior continued for years. (*Id.* at 78:11–12.) Plaintiff never sought any medical or psychological care after the incident, although he testified he might benefit from counseling if he could afford it. (Paul Castaneda Dep. at 64:5–24.)

Plaintiff testified that after the arrest, he did not recall teachers treating him differently, but he felt like friends looked at him differently. (Doc. 72-4, Paul Castaneda Dep. 66:1–24.) Plaintiff dropped out of high school in the tenth grade, attended Penn Foster (an online high school course), and received his high school diploma in 2014. (Paul Castaneda Dep. 4:17–5:12.) Since he turned 18 years old, Plaintiff has earned four or five certifications as a volunteer firefighter through the State of New Mexico Fire Academy. (*Id.* at 5:13–25.) Plaintiff testified

that but for his arrest, he might have felt he belonged in school, and he believes he might have done better in classes and gone on to college. (Doc. 72-4, Paul Castaneda Dep. 67:1–21.)

## III.   Legal Standards

### A.      Standard for Summary Judgment

Summary judgment is appropriate when the Court, viewing the record in the light most favorable to the non-moving party, determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if the trier of fact could return a verdict for either party. *Id*. In cases where the moving party will not bear the burden of persuasion at trial, the moving party bears the initial responsibility of identifying "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The party opposing the motion "must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990) (citing *Celotex*, 477 U.S. at 324). The non-movant may not rely merely on allegations or denials in its own pleadings. Fed. R. Civ. P. 56(e)(2); *see also Celotex*, 477 U.S. at 324. Additionally, "a party cannot rest on ignorance of

facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988)).

In considering a summary judgment motion, the Court determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Florom v. Elliott Mfg.*, 867 F.2d 570, 574 (10th Cir. 2013) (citation omitted), "the burden on the moving party may be discharged by" demonstrating to the district court "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

"Genuine factual issues must exist that 'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Harapat v. Vigil*, 676 F. Supp. 2d 1250, 1258–59 (10th Cir. 2009) (quoting *Anderson*, 477 U.S. at 250). "The mere existence of a scintilla of evidence will not avoid summary judgment." *Id.* at 1259 (citing *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1539 (10th Cir. 1993)). If the evidence in favor of the nonmovant "is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." *Id.* (quoting *Anderson*, 477 U.S. at 249).

"When both parties move for summary judgment, the court must analyze each motion individually and on its own merits." *G.M. ex rel. B.M. v. Casalduc*, 982 F. Supp. 2d 1235, 1241 (D.N.M. 2013) (citing *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("explaining that '[c]ross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another'" (alteration in *Casalduc*)). "Cross-motions for summary judgment, however, do authorize a court to assume that there is no evidence which

needs to be considered other than that which has been filed by the parties." *Id.* (quoting *Brubach v. City of Albuquerque*, 893 F. Supp. 2d 1216, 1223 (D.N.M. 2012) (internal citations omitted)).

### B. Law Regarding Qualified Immunity

The qualified immunity defense "protects law enforcement officials who are required to exercise their discretion by shielding them from liability for harm caused by reasonable mistakes." *Casalduc*, 982 F. Supp. 2d at 1241 (citing *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009)). "Qualified immunity provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity grants such officials "an entitlement not to stand trial or face the other burdens of litigation . . . ." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

"Courts must use a two-step analysis in deciding whether a party is entitled to qualified immunity." *Harapat*, 676 F. Supp. 2d at 1260. "When a defendant moves for summary judgment on the basis of qualified immunity, the burden shifts to the plaintiff to demonstrate, on the facts alleged, that (1) the defendant violated [his] constitutional or statutory rights and (2) the right was clearly established at the time of the alleged unlawful activity." *Castillo v. Day*, 790 F.3d 1013, 1019 (10th Cir. 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). "A right is clearly established if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Casalduc*, 982 F. Supp. 2d at 1241 (quoting *Courtney v. Okla. ex rel. Dep't of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013)). In other words, in the light of pre-existing law, the unlawfulness of the official's actions must be apparent. *Id.* "If the plaintiff

cannot meet either part of this burden, the defendant is entitled to qualified immunity." *Castillo*, 790 F.3d at 1019 (citation omitted).

"An officer is not liable for a reasonable mistake, whether it be a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (quoting *Herrera*, 589 F.3d at 1070); *see also Pearson*, 555 U.S. at 231. The Court may address either prong of the two-step qualified immunity analysis first. *Id.* (citing *Courtney*, 722 F.3d at 1222).

## IV.   Discussion

Plaintiff's Complaint contains seven counts, but neither the Complaint, his motion for partial summary judgment, nor his response to Defendants' motion for summary judgment offer full clarity or define with precision what causes of action he intends to bring. (*See* Docs. 2, 64, 72.) Most importantly, "he often fails to clearly identify which defendant(s) did what, making his vague allegations all the more difficult to follow." *Scott v. City of Albuquerque*, 2014-CV-665, at 3 (D.N.M. Aug. 17, 2015) (citing *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) ("[I]n § 1983 actions, such as here, the Tenth Circuit has 'stressed the need for careful attention to particulars, especially in lawsuits involving multiple defendants'")). The Court presents Plaintiff's claims below as understood using all of the pleadings, arguments, and evidence Plaintiff presented, in the same order as the counts in the Complaint.

A.     **Plaintiff's Motion and Defendants' Motion re: Count I of Complaint - Unlawful Arrest, Unlawful Charging,[4] Unreasonable Seizure, and Excessive Force in Violation of the Fourth Amendment**

1.     **Unlawful Arrest**

a.     **Law Regarding Unlawful Arrest**

The parties submitted cross-motions for summary judgment on the claims contained within Count I. (Docs. 62, 64.) Defendant Hensley's motion includes an assertion of qualified immunity. (Doc. 62 at 10–14.) To overcome Hensley's assertion of qualified immunity on the issue of unlawful arrest, Plaintiff must demonstrate a violation of his Fourth Amendment constitutional rights, and that the law on his rights was clearly established at the time Hensley violated it. *See Castillo*, 790 F.3d at 1019 (citing *Pearson*, 555 U.S. at 232). The Court will find a violation of an arrestee's "Fourth Amendment right to be free of unreasonable seizure if the officer makes a warrantless arrest without probable cause." *Harapat*, 676 F. Supp. 2d at 1263 (quoting *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985))). A warrantless arrest is proper so long as the police officer has "probable cause for the arrest." *Id.* (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she had reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Id.* (quoting *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2008) (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995))).

---

[4] Plaintiff includes "unlawful charging" in the title of his motion, but he presents no arguments or authority on the issue. (*See* Doc. 64.) Consequently, the Court will not address "unlawful charging" in this opinion, and any claim Plaintiff purports to make regarding "unlawful charging" is dismissed.

Plaintiff must also show that the constitutional right was clearly established "in light of the specific context of the case, not as a broad general proposition." *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. 223). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation . . . ." *Id.* (citation omitted). The officer will be entitled to qualified immunity "if the law did not put the officer on notice that his conduct would be clearly unlawful." *Id.* (citations omitted). "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Cortez*, 478 F.3d at 1120 (citing *Romero*, 45 F.3d at 1476). The doctrine of qualified immunity protects arresting officers "if they had 'arguable probable cause'; they are not required to have had actual probable cause." *Harapat*, 676 F. Supp. 2d at 1263 (quoting *Cortez*, 478 F.3d at 1120 & n. 15).

The Tenth Circuit has "held that, for a right to be clearly established, 'there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" *Cortez*, 478 F.3d at 1114–15 (quoting *Medina v. City of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992)). But the Court may find that officials were "on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 1115 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

The question of whether an officer had probable cause to arrest is a factual question and may not always be resolved at the summary judgment stage. If the Court finds no genuine issue of fact about whether there is probable cause, then the second prong of the qualified immunity analysis, the question of "whether an officer 'should have known' that his conduct violated constitutional rights[,]" is a legal question for the Court to determine. *Id.* at 1120 (citing *Pace v.*

16

*City of Des Moines*, 201 F.3d 1050, 1056 (8th Cir. 2000)). "The conduct was either objectively reasonable under existing law or it was not." *Id.* at 1120–21 (citing *Pace*, 201 F.3d at 1056).

> **b.** **Genuine Issues of Material Fact Remain on the Question of Whether Defendant Hensley Is Entitled to Qualified Immunity for Plaintiff's Claim of Unlawful Arrest**

The Court first turns to whether the "facts and circumstances within [Defendant Hensley's] knowledge and of which he . . . had reasonably trustworthy information are sufficient to lead a prudent person to believe that" Plaintiff committed an offense. *Harapat*, 676 F. Supp. 2d at 1263 (citations omitted). The parties do not agree on the facts surrounding the arrest, but under either party's version of the facts, the Court finds that there is a genuine issue of material fact about whether Defendant Hensley "had reasonably trustworthy information . . . sufficient to lead a prudent person to believe that" Plaintiff had committed an offense. *Id.* (citation omitted). Because there are factual questions surrounding the issue of whether Hensley had reasonably trustworthy information, the Court is unable to determine whether an objectively reasonable officer would know that his conduct was unlawful in this situation. *See Cortez*, 478 F.3d at 1114. For these reasons, the Court cannot determine whether Defendant Hensley is entitled to qualified immunity on the issue of unlawful arrest at this stage of the proceedings.

Defendant Hensley arrested Plaintiff for violating N.M. Stat. Ann. § 30-20-13(D), which states: "No person shall willfully interfere with the educational process of any public or private school by committing, threatening to commit or inciting others to commit any act which would disrupt, impair, interfere with or obstruct the lawful mission, processes, procedures or functions of a public or private school." "In evaluating whether the events leading up to this arrest amount to probable cause, [the Court asks] whether an objectively reasonable officer could conclude that the historical facts at the time of the arrest amount to probable cause." *Cortez*, 478 F.3d at 1116

(citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003); *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000)). "Probable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime." *Id.* (quoting *Pringle*, 540 U.S. at 371 n.2).

In his response to Defendants' motion, Plaintiff argues that Defendant Hensley cannot demonstrate evidence of a key component of § 30-20-13(D), that Plaintiff *willfully* interfered with the educational process. (Doc. 72 at 12–14.) Plaintiff and Defendant Hensley offer different versions of the facts relevant to Plaintiff's intent. Under either version, the only information Defendant Hensley had which arguably implicated Plaintiff as having violated § 30-20-13(D) was a statement attributed to a student aide who said Plaintiff refused to accompany the aide back to the ISS classroom.[5] The aide's statement was relayed to Defendant Hensley from Ms. Tate, who had presumably spoken to the student aide. There is no information in the summary judgment record that Defendant Hensley followed up with the student aide directly, that he knew the student aide's identity, or that he knew whether the aide had a reputation for being a reliable source of information. Rather than interviewing the aide himself, asking Plaintiff if he had refused to accompany the aide, speaking to Plaintiff's regular first period teacher, or engaging in any other investigative efforts, Officer Hensley responded to the aide's statement by immediately arresting Plaintiff. *See Cortez*, 478 F.3d at 1116 (where police officers' only evidence of a crime was a statement from a two-year-old child relayed through two adults by telephone, officers had

---

[5] Plaintiff testified that he has no recollection that a student aide ever came to his classroom on the morning of December 12, 2008 before Defendant Hensley arrived. (Paul Castaneda Dep. 37:5–17.) This testimony does not specifically controvert Officer Hensley's testimony about what he had heard from Ms. Tate. The trier of fact may consider Plaintiff's testimony, however, when weighing whether the student aide was a reliable source of information. It is entirely possible, for example, that the student aide did not go to Plaintiff's classroom and lied to Ms. Tate.

a duty to investigate more before effectuating a warrantless arrest); *see also Romero*, 45 F.3d at 1476–77 ("[T]he probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention").

The parties disagree about what Plaintiff said to Defendant Hensley when he collected Plaintiff from the first period classroom. Hensley testified that the only thing Plaintiff said was that he did not have ISS. (Hensley Dep. 50:6–8.) Plaintiff asserts that when Defendant Hensley came to his classroom that morning, Plaintiff gathered his belongings and volunteered to go to ISS right then. (Paul Castaneda Dep. 33:6–20.) Plaintiff testified that after he volunteered to go to ISS, Defendant Hensley replied, "no, you need to come to my office." (*Id.* at 33:19–20.) There is also evidence in the record that Plaintiff's teacher, Ms. Jones, may have told Defendant Hensley that Plaintiff "may very well have forgotten to go to ISS, since that is his disability." (Doc. 72-7.) Defendant Hensley contends that the evidence in the summary judgment record demonstrates that Plaintiff willfully interfered with the educational process. Hensley asserts that his decision and the probable cause determination were bolstered by the fact that his supervisor approved his decision to arrest. (Doc. 62 at 11.) Hensley cites no authority to support the conclusion that a Court must find probable cause for a warrantless arrest where an officer obtained supervisor approval.

Questions of fact remain that preclude the Court from deciding whether a reasonable officer would have concluded that Plaintiff's behavior violated the statute. The statute prohibits persons from *willfully* interfering with the educational process. N.M. Stat. Ann. § 30-20-13(D) (1978) (1953 Comp., § 40A-20-10). There are two cases that explicitly discuss the intent

requirement under this statute and its predecessor, N.M. Stat. Ann. § 40A-20-10(C) (1953),[6] in the context of an educational environment: *State v. Silva*, 525 P.2d 903 (N.M. 1974) and *Casalduc*, 982 F. Supp. 2d 1235.

The New Mexico Supreme Court examined the constitutionality of § 40A-20-10(C) in *Silva*. 525 P.2d 903. The *Silva* appellants had staged a sit-in at the Eastern New Mexico university president's office; police arrested the appellants after the university president repeatedly requested that they leave. *Id.* at 904. Appellants challenged the constitutionality of § 40A-20-10(C), arguing that the statute was void in part for vagueness. *Id.* at 904–08. In denying appellants' challenge on the issue of vagueness, the court noted that "the intent requirement . . . increases the statute's certainty." *Id.* at 907 (citing *Grayned v. City of Rockford*, 408 U.S. 104 (1972)). "Not only must the refusal be willful[,] . . . but the disruption must also be accompanied by general intent." *Id.* (citing *State v. Shedoudy*, 118 P.2d 280 (N.M. 1941); *State v. Puga*, 510 P.2d 1075 (N.M. Ct. App. 1973)).

Section 30-20-13(D) also requires willful intent: "No person shall willfully interfere with the educational process[7] . . . ." This Court examined the meaning of "willful" as used in § 30-20-

---

[6] Section 40A-20-10(C) provided:
> C. No person shall willfully refuse or fail to leave the property of, or any building or other facility owned, operated or controlled by the governing board of any institution of higher education upon being requested to do so by the chief administrative officer or his designee charged with maintaining order on the campus and in its facilities or a dean of a college or university, if the person is committing, threatens to commit or incites others to commit any act which would disrupt, impair, interfere with or obstruct the lawful mission, processes, procedures or functions of the institution.

[7] Plaintiff advances a novel argument in his own motion regarding construction of the words "educational process." (Doc. 64 at 16–17.) In short, Plaintiff contends that because Grant Middle School has a system in place to deal with students who refuse to attend their scheduled ISS dates, such discipline is part of the "educational process." (*Id.*) Even if he refused to accompany the student aide to the ISS classroom, Plaintiff asserts, his refusal was not a disruption of the educational process in violation of the statute, it was *part of* the educational process, because administrators anticipated and had a structure in place to deal with it. (*Id.*) Assuming New Mexico courts would agree with Plaintiff's construction, Defendant would then be entitled to qualified immunity because such a construction was not clearly established at the time of the incident. At any rate, Plaintiff offers no case law to support such a novel theory, and the Court finds it unpersuasive.

13(D) in a context that is very similar to the one at hand. *Casalduc*, 982 F. Supp. 2d at 1244. The 14-year-old plaintiff in *Casalduc* was texting on her cell phone during class at Harrison Middle School in violation of school policy, and she refused to put the phone away after multiple requests from her teacher. *Id.* at 1239–40. The dean of the school brought the student to the administrative offices, where she also ignored requests to relinquish the cell phone from the dean and a counselor. *Id.* at 1240.

The dean asked for assistance from Officer Casalduc, the School Resource Officer. *Id.* at 1238, 1240. Officer Casalduc explained the school's policy on cell phones to the student, but the student neither made eye contact with nor responded to Casalduc. *Id.* at 1240. Officer Casalduc explained § 30-20-13(D), how the student's actions in texting during class and refusing to turn over her phone violated the statute, and how her behavior disrupted and interfered with school functions. *Id.* Officer Casalduc then told the student "that he would not arrest her if she agreed to relinquish the phone." *Id.* He asked her for the phone again; she did not respond. *Id.* He gave her another warning, explaining that he would arrest her unless she relinquished her phone to the counselor. *Id.* The student did not make eye contact or respond to the officer, and he arrested her for violating § 30-20-13(D). *Id.*

In deciding whether the student's actions were willful within the context of the statute, the Court noted that "New Mexico case law defines criminal willfulness as connoting knowledge or as acting 'without just cause or lawful excuse.'" *Casalduc*, 982 F. Supp. 2d at 1244 (quoting *State v. Elliott*, 37 P.3d 107, 111 (N.M. Ct. App. 2001) (where defendant was scheduled to appear for a jury trial at 8:00 a.m. and he believed the trial started at 9:00 a.m. but still had not arrived at 9:15 a.m., defendant's behavior was "willful" in that it was "without just cause or lawful excuse"); *State v. Elmquist*, 844 P.2d 131, 131 (N.M. Ct. App. 1992) ("equating

willfulness and intention; an individual acts willfully when he is aware of what he is doing")). The Court found that the student's actions in repeatedly ignoring the officer's warnings and opportunities to comply would allow "a reasonable officer [to] conclude that she knowingly and without just cause disrupted school functions and interfered with school procedures." *Id.*

The evidence regarding whether Plaintiff's actions show willful intent are markedly different from that of the arrestees in either *Silva* or *Casalduc*. Whereas the *Silva* and *Casalduc* arrestees ignored multiple warnings and opportunities to comply from adult authority figures, the facts in evidence show that Plaintiff possibly received only one warning from a student aide. Under Plaintiff's version of the facts, not only did he *not* willfully refuse to comply with the student aide (he said the student aide never came to get him), but he also *volunteered* to go to the ISS classroom as soon as Defendant Hensley came to his room. There is also evidence that Hensley had information from Ms. Jones, Plaintiff's first period teacher, which could be construed to conflict with the student aide's statement. Further, there is no evidence in the record that demonstrates whether the student aide was a trustworthy source of information.

Defendant Hensley points to several other recent cases in the District of New Mexico that have analogous fact patterns. (Doc. 69 at 18 (citations omitted).) In each of these cases, an SRO arrested a student for violating the statute at issue here, and in each case, the Court found that the SRO had probable cause or arguable probable cause to support the warrantless arrest. *See J.H. ex rel. J.P. v. Bernalillo County*, 61 F. Supp. 3d 1085, 1115, 1122, 1159–60 (D.N.M. 2014); *Casalduc*, 982 F. Supp. 2d at 1240, 1244; *Scott*, 2014-CV-665, at 2, 9; *A.M. v. Acosta*, 2012-CV-74, at 4–7 (D.N.M. Sept. 19, 2014). But each case is also distinguishable from the facts in this summary judgment record in one important way—the SRO either saw the behavioral infraction for which the student was arrested, or the SRO had first-hand information from a teacher or

22

administrator who witnessed the behavioral infraction. *See J.H.*, 61 F. Supp. 3d at 1159–60; *Casalduc*, 982 F. Supp. 2d at 1240; *Scott*, 2014-CV-665, at 11; *Acosta*, 2012-CV-74, at 4. Defendant Hensley did not see Plaintiff violate the statute or have first-hand information from a teacher or administrator who witnessed Plaintiff violate the statute. Defendant Hensley presented no argument or authority about whether relying on the second-hand statement from the student aide as probable cause to arrest would be a reasonable mistake as contemplated by *Herrera*, 589 F.3d at 1070, and the Court declines to pass judgment on that question without further briefing from the parties.

"Summary judgment on the basis of qualified immunity is inappropriate where there is a factual dispute involving an issue on which qualified immunity turns." *Harapat*, 676 F. Supp. 2d at 1266 (citing *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988)). "Viewing the evidence presented in the light most favorable to [Plaintiff], the Court finds that it is uncertain whether [Defendant Hensley] is entitled to qualified immunity for [Plaintiff's] unlawful-arrest claim." *Id.* At this juncture, it is unclear whether Defendant Hensley justifiably relied on the student aide as a trustworthy source of information and had probable cause to arrest Plaintiff, or whether "a reasonable officer could conclude that [Plaintiff] knowingly and without just cause disrupted school functions and interfered with school procedures." *Casalduc*, 982 F. Supp. 2d at 1244. Plaintiff's motion for summary judgment is denied, and Defendants' motion for qualified immunity is denied on the issue of unlawful arrest.

### 2. Unreasonable Seizure

#### a. Law Regarding Unreasonable Seizure

Plaintiff contends in his motion for summary judgment that Defendant Hensley's seizure was unreasonable and served no legitimate governmental interest. (Doc. 64 at 22–24.) The

Fourth Amendment protects against an arrest conducted in "an 'extraordinary manner, unusually harmful to [the suspect's] privacy or . . . physical interests.'" *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (quoting *Wren v. United States*, 517 U.S. 806, 818 (1996)). Examples of searches and seizures that have been found to be extraordinary and unusually harmful include "seizure by means of deadly force, . . . unannounced entry into a home, . . . entry into a home without a warrant, . . . or physical penetration of the body . . . ." *Wren*, 517 U.S. at 818 (citations omitted).

> **b.      Defendant Hensley is Entitled to Qualified Immunity on Plaintiff's Claim of Unreasonable Seizure**

This Court examined the question of whether a seizure was unreasonable in a context that is strikingly similar to the one at hand. In *Scott v. City of Albuquerque*, the SRO arrested a student for skipping class in violation of the same statute. 2014-CV-665, at 1–2. The SRO handcuffed the student and transported him to the JDC. *Id.* at 1. The student, who was represented by the same firm as Plaintiff, brought many of the same claims as the ones at issue here against three of the same Defendants—Defendant Hensley (the SRO), Chief Schultz, and the City of Albuquerque. *Id.* In *Scott*, this Court found that "[t]he Supreme Court's analysis in *Atwater* guides the conclusion here." *Id.* at 12.

In *Atwater*, an officer arrested the petitioner for "failing to ensure her children were wearing seat belts" and for failing to wear her own seat belt. *Id.* (citing *Atwater*, 532 U.S. at 324). The officer handcuffed and transported Atwater to the police station. *Atwater*, 532 U.S. at 324. The Supreme Court found that while "Atwater's arrest was surely 'humiliating,' . . . it was no more 'harmful to . . . privacy or . . . physical interests' than the normal custodial arrest. . . . The arrest and booking were inconvenient and embarrassing to Atwater, but not so extraordinary

as to violate the Fourth Amendment." *Id.* at 354–55. The Court found that the arrest in *Scott* followed suit—while the student may have been embarrassed, there was "nothing to suggest any extraordinary means were used in Mr. Scott's arrest akin to those discussed by the Supreme Court in *Whren*, such as the use of deadly force or physical penetration of the body." *Scott*, 2014-CV-665, at 13 (citing *Whren*, 517 U.S. at 818). The same is true here. Plaintiff offers no argument or authority to support his contention that Defendant Hensley's use of flex cuffs or transport to the JDC during this warrantless arrest was extraordinary or unusually harmful to Plaintiff's privacy or physical interests.

Additionally, as the plaintiff did in *Scott*, Plaintiff points to the New Mexico Children's Code as authority to establish the proposition that Defendant Hensley's seizure of Plaintiff was unreasonable and extraordinary. (Doc. 64 at 26 (citing N.M. Stat. Ann. § 32A-2-11(A)).) *See also Scott*, 2014-CV-665, at 13–14. Plaintiff contends that because officers have the option of calling the Juvenile Probation Office to get a risk assessment completed over the telephone, that the choice to transport the child to the JDC instead constitutes an unreasonable seizure. (Doc. 64 at 26.) Plaintiff cites no authority to support this argument. The statute Plaintiff relies upon is, in fact, inapplicable to this situation. As this Court explained in both *Scott* and *J.H.*, § 32A-2-11(A) "concerns whether a child taken into custody for an alleged delinquent act should be placed in detention." *Scott*, 2014-CV-665, at 13; *see also J.H.*, 61 F. Supp. 3d at 1172. That section prohibits officers from placing "a child taken into custody" into *detention* unless and until certain criteria are met. § 32A-2-11(A). Defendant Hensley placed Plaintiff into *custody*; Hensley is not responsible for deciding whether juveniles in custody will be placed *into detention*. *Scott*, 2014-CV-665, at 13. An officer from the Children, Youth, and Families Department of the State of New Mexico would have made the decision about whether to place Plaintiff in detention. *J.H.*,

61 F. Supp. 3d at 1172 (citing N.M. Stat. Ann. §32A-2-5(B)(3)); *see also Scott*, 2014-CV-665, at 13. (*See also* Todd Dep. 7:12–8:7.) "Personal liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Scott*, 2014-CV-665, at 13 (quoting *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)) (alteration omitted)). Because "[Defendant] Hensley was not required to determine whether [Plaintiff] should be placed in secure detention," he was not personally involved in the alleged constitutional violation. *Id.* at 13. Moreover, Plaintiff cites no authority to support his contention that transporting Plaintiff to the JDC following "the arrest constitute[d] an 'extraordinary' procedure." *Scott*, 2014-CV-665, at 14.

Based on the evidence in the summary judgment record, "a reasonable jury could not conclude the manner in which [Defendant] Hensley arrested [Plaintiff] was unusually harmful to his privacy or physical interests." *Id.* Plaintiff has failed to show that Defendant Hensley conducted the arrest in an extraordinary manner, thereby violating Plaintiff's constitutional rights. Plaintiff's motion for summary judgment is denied on this claim. Officer Hensley is entitled to qualified immunity with respect to Plaintiff's claim for unreasonable seizure.

### 3.    Excessive Force

#### a.    Law Regarding Excessive Force

"When an officer moves for qualified immunity on an excessive force claim, 'a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law).'" *Harapat*, 676 F. Supp. 2d at 1264 (quoting *Cortez*, 478 F.3d at 1128). Courts use the same objective reasonableness standard to analyze Fourth Amendment excessive force claims "that governs other Fourth Amendment inquiries." *Id.* (quoting *Cordova*

*v. Aragon*, 569 F.3d 1183, 1192 (10th Cir. 2009); citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Courts evaluate objective reasonableness "under a totality of the circumstances approach [considering] the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Weigel v. Broad*, 544 F.3d 1143, 1151–52 (10th Cir. 2008) (citation omitted). "Additionally, a court must judge the reasonableness of a particular use of force from 'the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . That perspective includes an examination of the information possessed by the [officer]." *Harapat*, 676 F. Supp. 2d at 1264 (quoting *Weigel*, 544 F.3d at 1152).

Whether an officer violates a person's constitutional rights in using handcuffs during the seizure "depends on the objective reasonableness of the officer['s] actions." *Id.* (citing *Silvan W. v. Briggs*, 309 F. App'x 216, 224 (10th Cir. 2009)). While the Tenth Circuit does not have "a bright-line rule requiring plaintiffs to demonstrate physical injury when bringing excessive force claims . . . [,] when an excessive force claim relies upon unduly tight handcuffing, [the Tenth Circuit has] held that the plaintiff must show some actual injury." *Id.* (quoting *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1208 (10th Cir. 2008) (alterations in original)).

Where a plaintiff brings claims of unlawful arrest and excessive force that arise "from a single encounter," courts must "consider both the justification the officers had for the arrest and the degree of force they used to effect it." *Cortez*, 478 F.3d at 1127. Where the plaintiff can establish "that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest." *Id.* "If the plaintiff can prove that the officers used greater force than would have been

27

reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force." *Id.* While the "two inquiries are separate and independent, . . . the evidence may overlap." *Id.* It is possible for the plaintiff to prove "the unlawful arrest claim, the excessive force claim, both, or neither." *Id.* "Moreover, 'in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.'" *Harapat*, 676 F. Supp. 2d at 1265 (quoting *Cortez*, 478 F.3d at 1126).

### b.      Defendant Hensley is Entitled to Qualified Immunity on Plaintiff's Claim of Excessive Force

The Court analyzes the force applied in handcuffing Plaintiff in the context of a lawful arrest. *Cortez*, 478 F.3d at 1126. To overcome the protection of qualified immunity on his excessive force claim, "Plaintiff must show that (1) [Defendant Hensley] used excessive force during the arrest in violation of the Fourth Amendment, and (2) it would have been clear to a reasonable officer that the force exercised by [Defendant Hensley] was excessive and unconstitutional." *Casalduc*, 982 F. Supp. 2d at 1246. Again, the Court considers "what a reasonably prudent law enforcement officer would have found reasonable" considering "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Harapat*, 676 F. Supp. 2d at 1268 (quoting *Weigel*, 544 F. 3d at 1151–52).

"The Supreme Court has stated that a small amount of force, such as an arrest where one is handcuffed, placed in a police vehicle, and taken to the police station may be inconvenient and embarrassing, but it does not rise to the level of excessive force." *Id.* at 1269 (citing *Atwater*, 532

U.S. at 354–55). Where a plaintiff claims that the handcuffing itself constitutes excessive force, the Tenth Circuit has held that a court may find excessive force where there is an allegation of (1) actual injury due to the handcuffing and that (2) the "officer ignored [the] plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight." *Id.* at 1269 (quoting *Cortez*, 478 F.3d at 1129). "The Tenth Circuit requires more than de minimis injury." *Id.* (citing *Cortez*, 478 F.3d at 1129).

Plaintiff asserts that his only physical injury was that his fingers, hands, and/or wrists were blue with indentations for a few minutes after JDC staff cut the flex cuffs off, but then they were fine. (Compl. at ¶ 25; Paul Castaneda Dep. 42:4–17, 47:15–20.) The only evidence of an emotional injury is Plaintiff's testimony that he "shed a tear" in the holding cell and exhibited signs of anger and/or depression after the arrest. (Paul Castaneda Dep. 51:2–23, 55:5–56:3; Doc.72-8, Linda Castaneda Dep. 77:13–78:12.) Plaintiff admits that he suffered no lasting physical injury from being handcuffed, and he never sought medical or psychological care as a result of the arrest or handcuffing. (Paul Castaneda Dep. at 64:5–24.) These assertions, without more, are insufficient to demonstrate an actual physical or emotional injury.

The Tenth Circuit has held that to recover on an excessive force claim based on tight handcuffing, the plaintiff must demonstrate an actual injury, either physical or emotional. *Casalduc*, 982 F. Supp. 2d at 1247–48 (citing *Cortez*, 478 F.3d at 1127 n.25). An actual physical injury must be more than redness that lasts for days, chaffing, or soreness due to the handcuffs. *See Cortez*, 478 F.3d at 1129; *Silvan*, 309 F. App'x at 224–25. For example, the plaintiff in *Cortez v. McCauley* asserted that the handcuffs he wore left red marks for days. 478 F.3d at 1129. Even so, the Tenth Circuit held that Cortez's injury was "insufficient, as a matter of law, to support an excessive force claim if the use of handcuffs is otherwise justified." *Id. See also*

*Segura v. Jones*, 259 F. App'x 95, 103 (10th Cir. 2007) (where the marks on suspect's wrists from handcuffs were gone by the next day, the injury was de minimus). In the unpublished case *Silvan v. Briggs*, where a plaintiff "suffered 'chaffing and soreness of wrists' and 'extreme emotional trauma'" from being handcuffed in public, the Tenth Circuit found that these injuries were de minimus. 309 F. App'x at 224–25. That Plaintiff's fingers and/or wrists were blue for several minutes, without more, does not rise to the level of actual injury. Nor does Plaintiff contend that he suffered even "extreme emotional trauma," such as the *Silvan* plaintiff. *See id.* The Court finds that Plaintiff has offered insufficient evidence to demonstrate any actual injury.

Plaintiff testified that while he felt like the flex cuffs Defendant Hensley put on him were too tight, Plaintiff never asked Hensley to loosen the flex cuffs because he knew that flex cuffs could not be loosened, and because he "didn't want any trouble." (Paul Castaneda Dep. 42:18–43:9.) The Tenth Circuit has found that "unduly tight handcuffing may fail to rise to the level of excessive force if the plaintiff did not complain about the handcuffs and the officer was not otherwise aware that the handcuffs were too tight." *Casalduc*, 982 F. Supp. 2d at 1248 (citing *Cortez*, 478 F.3d at 1129). Defendant Hensley testified that he left a couple fingers' space between Plaintiff's wrists and the cuffs. (Hensley Dep. 57:25–58:4.) This testimony, together with the fact that Plaintiff never complained about the handcuff's tightness—regardless of Plaintiff's reasons for failing to complain—demonstrates that there is no evidence that Defendant Hensley was aware that Plaintiff's handcuffs were too tight.

Plaintiff asserts that because he was a minor at the time of the incident, the simple act of handcuffing him, even without an injury that is more than de minimus, is sufficient for an excessive force claim. (Doc. 72 at 16–17.) Plaintiff contends that *Holland ex rel. Overdorff v. Harrington*, a Tenth Circuit case, cautions officers against using even "harsh language" in

seizing children, but the Court finds that *Holland* is inapposite. 268 F.3d 1179, 1194–95 (10th Cir. 2001). In *Holland*, SWAT deputies clothed in hooded combat fatigues executed warrants on a residence, looking for a suspect accused of committing a violent assault. *Id.* at 1183–84. During the execution of the warrants, deputies aimed their weapons at several children, even after they had gained control of the premises and occupants. *Id.* at 1183–84, 1193. The Tenth Circuit found that under the circumstances, where SWAT deputies aimed loaded weapons at children, the minor-plaintiffs did not need to show actual physical injury to bring a claim of excessive force. *Id.* at 1195. *Holland*, however, "is not merely distinguishable, but entirely different: it involved pointing firearms directly at entirely innocent children who happened to be in the wrong place at the wrong time – not handcuffing a child who had recently, to the officer's eyes," violated a statute and disrupted the duties of at least one teacher. *J.H. ex rel. J.P. v. Bernalillo County*, No. CIV 12-0128, 2014 WL 3421037, at *89 (D.N.M. July 8, 2014).

The closer issue is whether Hensley's decision to handcuff Plaintiff was reasonable. The Court evaluates reasonableness by examining what information Defendant Hensley knew at the time, and by analyzing "the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Weigel*, 544 F.3d at 1151–52 (citation omitted); *see also Harapat*, 676 F. Supp. 2d at 1264. Plaintiff was not arrested for any kind of violent crime, so that factor does not weigh heavily in the analysis. As in *Cortez*, Plaintiff did not resist or attempt to evade seizure, he was never violent, and Defendant Hensley did not have a reason to believe Castaneda was armed or posed any kind of threat to Defendant Hensley's safety. *Cortez*, 478 F.3d at 1128.

31

In contrast to *Cortez,* where four officers were present for the suspect's warrantless arrest, *Cortez*, 478 F.3d at 1113, Defendant Hensley was acting alone and needed to control two suspects, and Defendant Hensley had information that the second suspect had cursed at the student aide before refusing to go to the ISS classroom. (Hensley Dep. 48:6–18, 49:14–20.) Defendant Hensley also testified that the information he had at the time from Ms. Tate was that Plaintiff and the second suspect had refused to accompany the student aide to the classroom. (*Id.* at 47:12–21.) The information that both suspects had earlier resisted accompanying a student aide, one of the suspects had cursed at the student aide, and Hensley's need to control the environment alone with two suspects were all likely factors in Hensley's decision to handcuff both students.[8] Looking at the totality of the circumstances, the Court finds that it is reasonable to conclude that a reasonable officer may have wanted to exercise extra caution alone with two students by restraining them with handcuffs. Plaintiff has failed to present evidence that he suffered more than a de minimus injury, he admits he failed to notify Defendant Hensley that the handcuffs were uncomfortable, and the Court finds that Defendant Hensley used no more force than would have been reasonably necessary for a lawful arrest. *See Cortez*, 478 F.3d at 1126. Plaintiff's motion for summary judgment is denied. Defendant Hensley is entitled to the protection of qualified immunity for Plaintiff's excessive force claim.

### B.   Count II—Violation of Substantive Due Process Rights Under the Fourteenth Amendment

In Count II of his Complaint, Plaintiff alleges that Defendant Hensley's "restraint and detention of Plaintiff deprived him of his liberty interest and served no governmental purpose." (Compl. at ¶ 42.) Plaintiff argues that "the New Mexico Children's Mental Health and

---

[8] While Plaintiff asserts that the student aide never came to his classroom, Plaintiff has no evidence to refute Defendant Hensley's state of mind.

Developmental Disabilities Act and the New Mexico Children's Code created a liberty interest in Plaintiff, a mentally disabled child, to be free of unnecessary restraints and unnecessary transportation to the JDC." (*Id.* at ¶ 43; *see also* Doc. 72 at 18–19.) Defendant Hensley argues that Count II fails as a matter of law, both because the claims for unlawful seizure and excessive force are properly brought under the Fourth Amendment, rather than the Fourteenth Amendment, and because Plaintiff has not offered evidence to demonstrate that Defendant Hensley violated his clearly established substantive due process rights. (Doc. 62 at 14.)

### 1.   Plaintiff May Not Bring Simultaneous Unlawful Seizure Claims Under the Fourth and Fourteenth Amendments

The Court turns first to whether Plaintiff may bring claims for unlawful arrest and seizure under both the Fourth and Fourteenth Amendments. "The Supreme Court has explained that, 'where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *J.H.*, 61 F. Supp. 3d at 1205 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. at 842). Plaintiff contends that his claim under the Fourteenth Amendment is "pled in the alternative." (Doc. 72 at 17.) But "the very assertion that Count II is 'in the alternative' to Count I is problematic because the Tenth Circuit has explained the Fourth Amendment applies 'leading up to and including an arrest[,]' while the Fourteenth Amendment applies 'between an initial seizure and post-conviction punishment.'" *Scott*, 14-CV-665, at 18 (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) (internal citation omitted)). "[I]t is difficult to understand this 'alternative' pleading when the amendments [Plaintiff] relies upon protect different time periods in the criminal justice process." *Id.* at 19. Because "the Fourth Amendment directly addresses the

alleged unconstitutional conduct," Plaintiff is precluded from bringing a substantive due-process claim for the same conduct. " *J.H.*, 61 F. Supp. 3d at 1206 (citing *Lewis*, 523 U.S. at 842).

Plaintiff argues that: (1) the New Mexico Children's Code creates a liberty interest under the Fourteenth Amendment regarding the detention of minors; (2) Defendant Hensley violated the New Mexico Children's Code when he arrested Plaintiff, and "no governmental interest was served by restraining [Plaintiff] and transporting him to the Juvenile Detention Center"; and (3) Plaintiff now has a due-process claim under the Fourteenth Amendment. (Doc. 72 at 18–19.) Where the plaintiff made an almost identical argument in *J.H. ex rel. J.P. v. Nation*, this Court explained that the plaintiff's "argument misunderstands the nature of the interests that the substantive due-process doctrine protects." *J.H.*, 61 F. Supp. 3d at 1206. State "statutes can create property and liberty interests," but the nature of those interests is based on procedural due process. *Id.* Procedural due process dictates "the procedures that the government must follow before it deprives an individual of certain liberty or property interests." *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)). The substantive due process doctrine "protects an entirely different collection of rights . . . ." *Id.* (citations omitted). "Substantive due process claims are not based on state law but are founded upon deeply rooted notions of fundamental personal interests derived from the Constitution." *Id.* (quoting *Graves v. Thomas*, 450 F.3d 1215, 1220 (10th Cir. 2006) (internal citation omitted)). Plaintiff's reliance on the New Mexico Children's Code "to establish a violation of substantive due-process is misplaced." *Id.* Plaintiff has failed to state a valid Fourteenth Amendment claim.

**2.      Plaintiff Fails to State a Claim for a Violation of His Substantive Due Process Rights**

Even if Plaintiff could bring simultaneous claims under the Fourth and Fourteenth Amendments, he "has failed to state a substantive due-process claim." *Id.* at 1207. In *Lewis*, the Supreme Court held that the threshold question to consider in a substantive due-process claim is whether the government official's behavior shocks the Court's conscience. 523 U.S. at 847. "To satisfy this demanding standard, [Defendant Hensley's] conduct 'must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.'" *J.H.*, 61 F. Supp. 3d at 1207 (quoting *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1223 (10th Cir. 2006) (internal citation omitted)). "[A] § 1983 violation based on substantive due process 'must be predicated on a state action manifesting one of two traditional forms of wrongful intent – that is, either (1) an intent to harm; or (2) an intent to place a person unreasonably at risk of harm . . . .'" *Ward v. Anderson*, 494 F.3d 929, 938 (10th Cir. 2007) (quoting *Uhlrig v. Harder*, 64 F.3d 567, 573) (10th Cir. 1995)).

Plaintiff has failed to demonstrate evidence of either. The summary judgment record establishes that Defendant Hensley arrested Plaintiff, placed Plaintiff in handcuffs, and transported Plaintiff to the JDC. Hensley's actions "do not manifest either an intent to harm [Plaintiff] or an intent to place [Plaintiff] unreasonably at risk of harm, as *Ward v. Anderson* required, 494 F.3d at 929, nor do they 'demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking," *Camuglia*, 448 F.3d at 1223, as is required "to state a claim that [Hensley] violated the Due Process Clause," *J.H.*, 61 F. Supp. 3d at 1207. Even if Defendant Hensley had no probable cause to arrest Plaintiff, Plaintiff points to no authority where this in itself is sufficiently conscience-shocking to warrant a claim under the

35

Fourteenth Amendment. Neither poor judgment nor an inadequate grasp of the law equate to an intent to harm or place Plaintiff at risk of harm.

### 3.   Plaintiff Fails to State a Claim for a Violation of His Procedural Due Process Rights

Without citing any supporting authority, Plaintiff also argues that Defendant Hensley's actions deprived Plaintiff of the right to a public education. (Doc. 72 at 19.) The Supreme Court has held that students with access to free public education have a cognizable property interest protected under the Due Process Clause, "and therefore are entitled to certain procedural due process protections within the educational context." *Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, 535 F.3d 1243, 1257; *see also Goss v. Lopez*, 419 U.S. 565, 576 (1975). The Tenth Circuit has noted that "[w]hen complete deprivation of education occurs, such as when a student is removed from the school for a lengthy time period, the [Supreme] Court ruled that the student at minimum is entitled to 'notice and . . . some kind of hearing,' though the 'timing and content of the notice and the nature of the hearing will depend on the appropriate accommodation of competing interests involved.'" *Couture*, 535 F.3d at 1257 (quoting *Goss*, 419 U.S. at 578–59). *Goss* and its progeny, however, largely deal with suspensions and other discipline-related measures. *See Goss*, 419 U.S. at 576 (determining a ten-day suspension was a non-de minimis deprivation of student's property right); *Couture*, 535 F.3d at 1257–58 (holding student was not entitled to procedural due process protections where student spent twelve hours in a timeout room instead of in a classroom over a period of two and a half months,); *Laney v. Farley*, 501 F.3d 577, 581–82 (6th Cir. 2007) ("[A] one-day in-school suspension did not infringe on the plaintiff's property or liberty interest"). The Court has been unable to find a single case where a student's arrest, lawful or not, implicated the protections associated with the right to public

education. Accordingly, Plaintiff has failed to demonstrate either that Defendant Hensley violated his due process rights or that any such rights were clearly established. Defendant Hensley is entitled to qualified immunity on Count II.

C.   **Counts III & IV—Violation of ADA in Criminalizing Disabilities and Suspending Children for Manifestations of Disabilities, and in Failing to Accommodate Children with Disabilities**

1.   **Plaintiff Fails to State a Claim Under the ADA**

Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Plaintiff alleges that (1) the Albuquerque Police Department denied him the benefits from such services, programs, or activities, "including but not limited to the benefits of being treated with dignity[,] . . . and for not being arrested for being forgetful"; (2) "the Albuquerque Police Department discriminated against Plaintiff by arresting him and charging him with a delinquent act for the manifestations of his disability" while Plaintiff was participating in lawful conduct"; and (3) "Defendant City has failed and refused to develop adequate training and policies to accommodate children with disabilities, to minimize any contact with law enforcement, and to minimize the effect of any charges filed against children with disabilities." (Compl. at ¶¶ 49–50, 61.) The Court finds that Plaintiff's claims fail as a matter of law because he has not demonstrated that he is disabled as defined by the ADA.

"To establish a prima facie case under the ADA before the 2008 amendments, a plaintiff must first prove he . . . 'is a qualified individual with a disability.'"[9] *Rhodes v. Langston Univ.*,

---

[9] The Tenth Circuit held that the 2008 Amendments, which were effective on January 1, 2009, "should not be applied retroactively . . . ." *Rhodes v. Langston University*, 462 F. App'x 773, 777 (10th Cir. 2011). The amendments were enacted "with the explicit purpose of rejecting certain standards and reasoning of several Supreme

462 F. App'x 773, 777 (10th Cir. 2011) (quoting *Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999)). "To satisfy the ADA's definition of disability, a plaintiff must '(1) have a recognized impairment, (2) identify one more appropriate major life activities, and (3) show the impairment *substantially limits* one or more of those activities.'" *Id.* at 777 (quoting *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1216 (10th Cir. 2007); citing 42 U.S.C. § 12102(2)).

Plaintiff "must 'articulate with precision' both his impairment and the major life activity it substantially limits." *Id.* (quoting *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1218 (10th Cir. 2010) (internal citations omitted)). Defendants concede that ADHD qualifies as a disability under the ADA, but they argue that Plaintiff has not offered any evidence to show that his disability substantially limited one or more major life activities. (Doc. 62 at 20.) In response, Plaintiff asserts,

> Castaneda had been receiving ongoing treatment and medication for ADHD. The effects of Castaneda's ADHD are well documented in both Albuquerque Public Schools records and in his own medical and mental health records. ADHD affected Castaneda's attention span, retention of information, and memory. It also had adverse effects on a wide array of academic and behavioral skills. Castaneda's struggle with the disorder is evidenced by his IEP and Behavioral Intervention Plan . . . , as well as by statements by medical professionals that treated him for the condition.

(Doc. 72 at 23.) "Major life activities" are defined in 29 C.F.R. § 1630.2(i) and include activities such as learning, concentrating, and thinking, which are arguably related to the manifestations of Plaintiff's disability as described in the Complaint and the response to Defendants' motion. 29 C.F.R. §1630.2(i); 45 C.F.R. § 84.3(j)(2)(ii).

---

Court opinions[,]" including "a rejection of an analysis 'that whether an impairment substantially limits a major activity is to be determined with reference to the ameliorative effects of mitigating measures.'" *Id.* (quoting PL 110-325, 12 Stat. 3553 (September 25, 2008)). The presence or absence of mitigating measures have no effect on the Court's determination that Plaintiff has failed to demonstrate that he is disabled as defined by the ADA.

"The ADA does not define the term 'substantially limits.'" *Rhodes*, 462 F. App'x at 777. To determine whether Plaintiff is substantially limited in a major life activity, the Court "must consider the evidence [Castaneda] offered in an effort to demonstrate that [he] was significantly restricted in learning," concentrating, and thinking. *Doyal v. Okla. Heart, Inc.*, 213 F.3d 492, 496 (10th Cir. 2000). Plaintiff offered a Psychiatric Diagnostic Examination from Donald Flammer, Ph.D., dated March 31, 2008. (Doc. 72-2.) Dr. Flammer noted that Plaintiff's mother requested the reevaluation because Plaintiff "continues to be failing at school." (*Id.* at 1.) Dr. Flammer reports that Plaintiff "is failing most classes. He is not having behavioral difficulties with teachers, but is in ISS occasionally for not doing his work." (*Id.*) Dr. Flammer noted that Plaintiff was evaluated by the school in May 2005 "to obtain information about his level of intellectual ability. . . . On the basis of that evaluation in 2005, Paul was identified as not meeting criteria for specific learning disability." (*Id.*) Dr. Flammer "administered a variety of psychological testing tasks" at the March 2008 visit, but Plaintiff did not include the test results in the summary judgment record. (*Id.*) Dr. Flammer recommended increasing Plaintiff's Concerta dosage from 36mg to 54mg and noted that Plaintiff would need "close monitoring and supervision of his academic performance with very consistent communication between parents and his teachers." (*Id.* at 2–3.)

Plaintiff did not submit the results of any further testing through the school system. Outside of Dr. Flammer's report and Plaintiff's testimony that he needs to "reread things to fully understand it because I will put random words in," and that he is "a little antsy . . . wanting to just move and get out[,]" (Paul Castaneda Dep. 10:1–20; 11:17–18), there is no other evidence in the record that articulates with precision how Plaintiff's disability limited his learning, thinking, concentrating, or any other major life activity. *Rhodes*, 462 F. App'x at 777. The only other

relevant document Plaintiff submitted is his IEP dated April 24, 2009, which listed one of his necessary "[a]ccommodation[s] of instruction" as "[c]hecking for understanding"; a necessary "[p]resentation of instruction" as "repeated instructions"; and a "[b]ehavior management accommodation" of "[f]requent reminder of rules." (Doc. 72-1.)

Dr. Flammer's report does not provide sufficient evidence that Plaintiff's disability substantially limited a major life activity. While Dr. Flammer noted that Plaintiff was failing most classes, Plaintiff did not produce evidence of his failing grades or that he had been held back. The existence of an IEP or the fact that Plaintiff attended special education classes are also insufficient without more specific evidence to establish that Plaintiff's ADHD substantially limited major life activities. *See, e.g.*, *Ellenberg v. N.M. Military Inst.*, 572 F.3d 815 (10th Cir. 2009) (finding that the "mere receipt of an [IEP] . . . by itself [does not] demonstrate a substantial limitation" of a major life activity); *J.H.*, 2014 WL 3421037, at *21 (noting that "[n]othing contained in the IEP or BIP indicate that [the plaintiff's] behavior . . . was the result of a diagnosed physical or mental impairment that substantially limited a major life activity"). Moreover, Plaintiff testified that the last time he got a refill on his prescription or saw a psychologist or any other specialist about a learning disability was in eighth grade. The Court finds it hard to believe that Plaintiff was substantially limited in his major life activities where there is no evidence that anyone sought help for him after eighth grade. The facts in evidence do not point to a conclusion that Plaintiff was substantially limited in major life activities relevant to learning. In fact, Plaintiff not only went on to earn his high school diploma, but he also earned four or five certifications as a volunteer firefighter through the State of New Mexico Fire Academy. (Paul Castaneda Dep. 5:13–25.)

"[N]umerous courts, including the Tenth Circuit, have concluded that ADHD does not limit major life activities sufficiently to raise a claim under the ADA." *Evans v. Century Link Corp.*, No. 2:12CV343, 2013 WL 1284874, at *4 (D. Utah Mar. 8, 2013) (citing *Johnson v. Sedgwick Cty. Sheriff's Dept.*, 461 F. App'x 756, 759 (10th Cir. 2012) ("holding that the plaintiff failed to provide any evidence that ADHD substantially limited a major life activity"); *Knapp v. City of Columbus*, 192 F. App'x 323, 330 (6th Cir. 2006) ("concluding that firefighters with ADHD are not disabled within meaning of ADA absent evidence that they were substantially limited in major life activities"); *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 155 (1st Cir. 1998) ("noting that a plaintiff with ADHD was not impaired in learning where he never experienced significant academic difficulties")). The same holds true here. Plaintiff "failed to present evidence of any specific instances where [he] had difficulty learning[,]" or where his attention span, retention of information, memory, or forgetfulness interfered with his life. *Doyal*, 213 F.3d at 497. The only specific instance Plaintiff refers to regarding forgetfulness is when he forgot to attend ISS on December 12, 2008, although he also testified that he thought the principal had cleared the ISS referral. (Paul Castaneda Dep. 54:17–25.) "Forgetfulness is an exceedingly common human frailty." *Doyal*, 213 F.3d at 497. Without more evidence that articulates with precision how Plaintiff's forgetfulness substantially limited his major life activities, *Rhodes*, 462 F. App'x at 777, there is insufficient evidence in the summary judgment record "to support a reasonable inference that [Plaintiff] was significantly restricted" with respect to any major life activities. *Doyal*, 213 F.3d at 497. Neither the IEP's listed accommodations, Dr. Flammer's report, nor the submitted testimony provide sufficient evidence that Plaintiff's disability *substantially* limited his major life activities. Consequently, Plaintiff is unable to satisfy the first element to establish a claim under the ADA. *See* 42 U.S.C. §12112(a).

**D.      Count V—Battery and False Imprisonment and Negligent Training and Supervision under the N.M. Tort Claims Act and Article II, Section 10 of the New Mexico Constitution**

Both the allegations in Plaintiff's Complaint and Plaintiff's arguments in response to Defendants' motion with respect to Count V are convoluted and confusing. It appears to the Court that Plaintiff intends to make several claims within Count V: first, a claim under the New Mexico Tort Claims Act against Defendant Hensley for battery and false imprisonment; second, a claim under the Tort Claims Act against the remaining Defendants for negligent training and supervision; third, a claim that Defendants' actions violated the New Mexico Children's Code; and fourth, a claim that Defendant Hensley violated Plaintiff's constitutional rights under Article II, Section 10 of the New Mexico Constitution. (Compl. at 65–69; Doc. 72 at 25–29.)

**1.      Plaintiff's State-Law Tort Claims for Battery and False Imprisonment Remain**

Plaintiff has brought state-law tort claims against Defendant Hensley for battery and false imprisonment[10] and against the remaining Defendants for negligent training and supervision with respect to the alleged torts. (Doc. 2, Compl. at ¶¶ 65–69.) Defendants argue that Plaintiff is unable to maintain common law claims for battery and false imprisonment because Defendant Hensley had probable cause to arrest Plaintiff. (Doc. 62 at 22–23.) As determined *supra* at IV(A)(1)(a), the Court did not grant Defendants summary judgment on Plaintiff's Fourth Amendment claim for unlawful arrest; therefore, Defendants' argument regarding the state-law tort claims fails. Because neither party fully briefed the Court on the issues surrounding the state-

---

[10] Police officers acting in their official capacities enjoy "immunity from tort suits unless the [Tort Claims] Act sets out a specific waiver of that immunity." *Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't*, 916 P.2d 1313, 1316 (N.M. 1996) (citing N.M. Stat. Ann. § 41-4-4; *Abalos v. Bernalillo Cty. Dist. Atty's Office*, 734 P.2d 794, 797 (N.M. Ct. App. 1987), *cert. quashed*, 738 P.2d 907 (1987)). That immunity "does not apply to liability for" certain injuries "resulting from . . . battery, false imprisonment," or other named torts "when caused by law enforcement officers while acting within the scope of their duties." *Id.* (quoting § 41-4-12).

law tort claims with respect to Defendant Hensley, the claims are not yet ripe for decision. Defendants' motion is denied regarding the claims for battery and false imprisonment with respect to Defendant Hensley.

## 2.   Plaintiff's State-Law Tort Claims for Negligent Training and Supervision Are Dismissed

With respect to the state-law tort claims of negligent training and supervision, Defendants argue that because "Plaintiff's claims for battery and false imprisonment fail as a matter of law, so too do his claims for negligent training and supervision." (Doc. 62 at 23.) Defendants further contend that Plaintiff has no evidence to demonstrate any Defendant, including Chief Schultz or Sergeant Keith, was negligent in training or supervising Defendant Hensley, or that said negligence caused Plaintiff's alleged injuries." (*Id.*) The Court disagrees with Defendants' first argument but finds merit in Defendants' second argument.

"To name a particular entity in an action under the Tort Claims Act requires two things: (1) a negligent public employee who meets one of the waiver exceptions under [N.M. Stat. Ann. §§] 41–4–5 to –12; and (2) an entity that has immediate supervisory responsibilities over the employee." *Abalos v. Bernalillo Cty. Dist. Atty's Office*, 734 P.2d 794, 799 (N.M. Ct. App. 1987). Plaintiff has met his burden to show that there is a genuine issue of material fact on the first prong, but Plaintiff has provided no evidence to show that any of the named Defendants had "immediate supervisory responsibilities over" Defendant Hensley. *Id.* Because Plaintiff has not met his burden to show that the City of Albuquerque, Defendant Schultz, or Defendant Keith supervised Defendant Hensley, they are not properly named as defendants "in an action under the Tort Claims Act." *Id.*

Defendants have demonstrated the absence of a genuine issue of material fact regarding Plaintiff's negligent training and supervision claim under the Tort Claims Act. Where the movant carries the initial "burden of showing the absence of a genuine issue of material fact, . . . the nonmovant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996). Because Plaintiff has not met his burden to demonstrate a genuine issue of material fact regarding state-law tort claims of negligent training and supervision, Defendants are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

### 3.     Any Claims Plaintiff Attempts to Bring Under the New Mexico Children's Code Are Dismissed

Plaintiff argues in his response that he "enjoyed statutory protections under the Children's Code that render Defendant Hensley's battery and false imprisonment unprivileged and illegal." (Doc. 72 at 27.) Plaintiff did not specifically include this claim in Count V of his Complaint, although he did mention the Children's Code in Count II as part of his substantive due process claim. (*See* Compl. at ¶¶ 43, 65–69.) "New Mexico's statutory scheme governing child detention is carefully constructed to respect a child's interests." *J.H.*, 2014 WL 3421037, at *111. New Mexico law requires that "[a] person taking a child into custody shall, with all reasonable speed: . . . (3) deliver the child to a place of detention as provided in Section 32A-2-12 NMSA 1978 . . . ." N.M. Stat. Ann. § 32A-2-10(A)(3). "Places of detention" are facilities appropriate for children, and include "a detention facility certified by the department for children alleged to be delinquent children . . . ." § 32A-2-12(A)(4); *see also J.H.*, 2014 WL 3421037, at *111.

Plaintiff alleges that Defendant Hensley violated § 32A-2-11(A), which dictates that "a child taken into custody for an alleged delinquent act shall not be placed in detention unless a detention risk assessment instrument is completed and" certain determinations are made. § 32A-2-11(A). Plaintiff argues that Hensley's transportation of Plaintiff to the JDC was unlawful under this section of the Children's Code, apparently because the risk assessment was not performed until after Plaintiff arrived at the JDC. (Doc. 72 at 27–28.) As discussed *supra* at IV(A)(2)(b), Officer Hensley placed Plaintiff into *custody*; Hensley was not responsible for deciding whether Plaintiff would be placed *into detention*. *Scott*, 2014-CV-665, at 13. An officer from the Children, Youth, and Families Department of the State of New Mexico would have made the decision about whether to place Plaintiff in detention. *J.H.*, 61 F. Supp. 3d at 1172 (citing N.M. Stat. Ann. §32A-2-5(B)(3)); *see also Scott*, 2014-CV-665, at 13. (*See also* Todd Dep. 7:12–8:7.) Because Defendant Hensley, "acting within the scope of [his] duties" could not have violated any of Plaintiff's rights under the Children's Code regarding detention, Plaintiff's claim fails as a matter of law and is dismissed. *Weinstein*, 916 P.2d at 1316 (N.M. 1996) (citations omitted).

### 4. Plaintiff's Claim Under Article II, Section 10 of the New Mexico Constitution Remains

Finally, it appears to the Court that Plaintiff intended to bring a claim under Article II, Section 10 of the New Mexico Constitution, the state's equivalent of the Fourth Amendment. (*See* Compl. at 67; Doc. 72 at 28–29.) Article II, Section 10 is interpreted "more expansively than the Fourth Amendment." *State v. Leyva*, 250 P.3d 861, 877 (N.M. 2011) (quoting *State v. Garcia*, 217 P.2d 1032, 1045 (N.M. 2009) (Bosson, J. specially concurring) (internal citation omitted)). The New Mexico Supreme Court has found that a warrantless arrest must be supported by probable cause and exigent circumstances to be reasonable under Article II, Section

10. *Campos v. State*, 870 P.2d 117, 120–21 (N.M. 1994). Because Defendants did not specifically address this requirement in their motion, any claims Plaintiff brings under Article II, Section 10 of the New Mexico Constitution remain.

   E.   **Count VI—Violations of Rights Secured by Article II, Section 18 of the New Mexico Constitution**

      1.   **Plaintiff's Claim Under Article II, Section 18 of the New Mexico Constitution Is Dismissed**

In his Complaint, Plaintiff alleged that "[a]ll of the actions taken by Defendants and referred to in this Complaint have deprived and continue to deprive Plaintiff of rights secured by the New Mexico Constitution, specifically the right to Substantive Due Process as guaranteed by Article II, Section 18." (Compl. at ¶ 72.) In their motion for summary judgment, Defendants made several arguments against this claim: first, that Plaintiff fails "to identify how his substantive due process or equal protection rights were violated"; second, "because there is no waiver of sovereign immunity for these claims, and therefore no basis for a private damages action for the alleged violation of this provision of the state constitution"; and third, "because claims arising out of Defendant Hensley's decision to arrest and handcuff Plaintiff are more properly analyzed under Article II, Section 10 of the New Mexico Constitution"; and finally, "because Plaintiff has no evidence to prove that Defendant Hensley engaged in intentional discrimination, or that Plaintiff was treated differently based on his supposed disability." (Doc. 62 at 24–25.)

Plaintiff failed to address Defendants' arguments in his response brief. (*See* Doc. 72.) Because Defendants carried their burden to show that there is an "absence of a genuine issue of material fact," Plaintiff was required to "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Jenkins*, 81 F.3d at

990. Because Plaintiff has not met his burden to demonstrate a genuine issue of material fact regarding his claim under Article II, Section 18, Defendants are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

### F.    Count VII—Negligent Training and Supervision Under § 1983

#### 1.    Plaintiff Fails to State a Municipal Liability Claim

To make a claim of municipal liability under § 1983, Plaintiff must show "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1318 (10th Cir. 1998) (citing *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and deprivation of federal rights." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998 (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404 (1997)). Because Plaintiff's claim for unlawful arrest remains, the Court turns to the second prong— whether Plaintiff has shown that "a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers*, 151 F.3d at 1318. Plaintiff contends that "Defendants City of Albuquerque and Police Chief Ray Schultz were a moving force behind the violation[,]" because they "failed to train school resource officers at all regarding how to deal with special education students, and employed a de facto policy requiring officers to arrest for manifestations of their disabilities." (Doc. 72 at 20–21.)

#### a.    Inadequate Training

Plaintiff first contends that the City of Albuquerque and Police Chief Ray Schultz failed to properly train SROs "at all regarding how to deal with special education students . . . ." (*Id.*)

To maintain a claim for "municipal liability based on a policy of inadequate training[,]" plaintiff must prove "the municipality's 'deliberate indifference' to its inhabitants – i.e., the failure to train must 'reflect[] a "deliberate" or "conscious" choice by a municipality.'" *Barney*, 143 F.3d at 1307 (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (alteration in original)). A plaintiff may satisfy the deliberate indifference standard by establishing that "the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Id.* (citing *Bd. of Cty. Comm'rs of Bryan Cty., Okla.*, 520 U.S. at 407–408). Plaintiff can show such notice "by proving the existence of a pattern of tortious conduct." *Id.* (citing *Bd. of Cty. Comm'rs of Bryan Cty., Okla.*, 520 U.S. at 407). In other words, a plaintiff may show a pattern of similar constitutional violations by municipal employees. *Bd. of Cty. Comm'rs of Bryan Cty., Okla.*, 520 U.S. 397, 409. In the absence of such a pattern and "[i]n a narrow range of circumstances," a plaintiff may establish deliberate indifference by demonstrating that "a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations." *Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003).

Plaintiff offers two exhibits in support of his claim for municipal liability, presumably to show a pattern of similar constitutional violations. *See Bd. of Cty. Comm'rs of Bryan Cty., Okla.*, 520 U.S. at 409. Exhibit 9 includes summaries from eleven police reports from 2008–2011, documenting the arrests of school children for various acts; Exhibit 10 is an affidavit of Joseph P. Kennedy, counsel for Plaintiff, verifying that he compiled the summary of police reports in Exhibit 9. (Docs. 72-9; 72-10.) These summaries, however, do not show that the arrests were

unlawful, that the officers used excessive force, that the officers were all SROs or had the same training, that the children were all disabled, that the children brought suit against the City or the officers for constitutional violations, or that the arrests were sufficiently similar to the situation at hand. In other words, the summaries do not show a pattern of tortious conduct or similar constitutional violations. *See Bd. of Cty. Comm'rs of Bryan Cty., Okla.*, 520 U.S. at 409; *see also Barney*, 143 F.3d at 1307. Nor do the summaries provide evidence sufficient to demonstrate that the City had notice that any of their training programs were deficient such that they would cause constitutional violations similar to that alleged in Plaintiff's arrest. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011) (reviewing plaintiff's evidence that state "courts had overturned four convictions because of *Brady* violations by prosecutors in defendant's office[,]" and determining it was not enough to put defendant "on notice that the office's *Brady* training was inadequate with respect to the" specific facts of the *Brady* violation in that case). As such, the summaries provide no evidence that "the City had notice that its actions (or failures to act) were likely to result in constitutional violations."[11] *Carr*, 337 F.3d at 1229.

What's more, Plaintiff "has not illustrated how the City consciously chose to disregard the risk of harm." *Id.* To establish deliberate indifference, Plaintiff must demonstrate not only "the risk inadequate training poses[,]" but also "the City's awareness of that risk." *Id.* (quoting *Brown v. Gray*, 227 F.3d 1278, 1288–89 (10th Cir. 2000)). "Moreover, a finding of 'deliberate indifference' in this situation requires a showing that 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the

---

[11] Even if Plaintiff's exhibits were evidence of municipal liability, the Court may not consider them because they would be inadmissible at trial as hearsay. *See Adams v. Am. Guarantee Liab. Ins. Co.*, 233 F.3d 1242, 1264 (10th Cir. 2000) ("In order to survive summary judgment, the content of the evidence that the nonmoving party points to must be *admissible*.") (citing *Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1268 (10th Cir. 1998)).

policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Id.* (quoting *City of Canton*, 489 U.S. at 390).

In *Brown*, the Tenth Circuit found that where the chief of police (whom the parties both treated as a policymaker) testified that "a conscious decision was made" regarding a training program, acknowledged the risk of the policy at issue, and "insisted that no further training was necessary" to implement the policy, the plaintiff had provided sufficient evidence for the jury to find that the City "was deliberately indifferent to the risks posed by the inadequate training." *Brown*, 227 F.3d at 1289. In contrast, the Tenth Circuit affirmed summary judgment for Oklahoma City in *Carr*, even though plaintiff's "experts found numerous asserted deficiencies in the City's policies and training programs." *Carr*, 337 F.3d at 1225. The plaintiff's enumeration of how the officers were inadequately trained "without proffering any evidence of knowledge of the purported deficiencies on the part of the City" was insufficient to demonstrate deliberate indifference. *Id.* at 1229. Because the experts "merely assert[ed] that the City failed to train, but nowhere [did] they show that the need for training was obvious to the City in the *City of Canton* sense[,]" there was inadequate evidence to show the necessary intent. *Id.*

Likewise, Plaintiff failed to come forward with any evidence that would demonstrate either the risk of inadequate training or the City's awareness of such a risk. *See id.*; *see also Brown*, 227 F.3d at 1288–89. Plaintiff offers no testimony or other evidence to support his claim that Defendants failed to train Defendant Hensley or other SROs in any area, that the City had notice that there was any lack of training, or that the City consciously disregarded such notice. *See Barney*, 143 F.3d at 1307. Exhibits 9 and 10 are insufficient to establish that "the City had notice that its actions (or failures to act) were likely to result in constitutional violations." *Carr*, 337 F.3d at 1229.

The only testimony submitted that is relevant to the issue of training is found in Plaintiff's Exhibit 11, which contains portions of the deposition of Ms. Jeannie Masterson. (Doc. 72-11, Masterson Dep.) Plaintiff does not identify Ms. Masterson, but it appears that she is involved as an employee in some capacity with the Juvenile Justice Services system. (*Id.* at 82:9–85:7.) In her deposition, she affirms that there are "trainings for SROs and officers who work in schools." (*Id.* at 87:10–11.) She does not speak to the adequacy of the training or the City's awareness of a lack of training. (*See id.*)

In rare circumstances, "evidence of a single violation of federal rights" may be enough to trigger municipal liability; but plaintiff must also provide evidence that the "municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation . . . ." *Bd. of Cty. Comm'rs of Bryan Cty., Okla.*, 520 U.S. at 409 (citation omitted). Again, Plaintiff has not offered any evidence that the City failed to train its officers on how to handle situations similar to the one at issue here. For the foregoing reasons, Plaintiff has failed to show that any alleged failure to train was a consequence of the City's deliberate indifference. *See Barney*, 143 F.3d at 1307.

### b.    De Facto Policy

Plaintiff also contends that Defendants "employed a de facto policy requiring officers to arrest disabled students for manifestations of their disabilities." (Doc. 72 at 21.) In claiming that the City had a policy that required officers to make arrests of disabled individuals for manifestations of their disabilities, Plaintiff is essentially claiming "that a particular municipal action *itself* violates federal law, or directs an employee to do so . . . ." *Bd. of Cty. Comm'rs of Bryan Cty., Okla.*, 520 U.S. at 404. As such, the Supreme Court found that a plaintiff must come forward with proof that "establishes that the municipality acted culpably." *Id.* at 405. Summaries

of the eleven arrests of children between 2008 and 2011 are not sufficient to demonstrate that Defendants maintained an official or de facto policy or custom requiring that officers arrest suspects for manifestations of their disabilities. Plaintiff offers no testimony, expert or otherwise, no training manuals, no comparisons between the City's training program and the programs of other cities, etc. to establish that Defendants either directly or indirectly required their officers to make arrests that would violate the rights of disabled individuals. For the foregoing reasons, Plaintiff's claim for municipal liability presents no genuine issue of material fact and Defendants are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

### 2.     Plaintiff Fails to State a Supervisory Liability Claim

Plaintiff alleges that Defendants Schultz and Keith "were responsible for training Defendant Hensley to protect and serve the public[,]" and they "breached their duty . . . when they failed to properly train its officers to properly interact with children, especially disabled children[, and] by not training SROs to comply with the Children's Code." (Compl. at ¶¶ 78, 80–81.) Defendants contend Plaintiff's claim for supervisory liability fails as a matter of law because he cannot establish that Chief Schultz or Sergeant Keith had any personal involvement in the alleged constitutional violation, or that they—with deliberate indifference—were responsible for a policy that contributed to the alleged harm. (Doc. 62 at 18 (citing *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010)).)

That Defendants Schultz and Keith were in a supervisory position over Defendant Hensley—a fact Plaintiff has not demonstrated in the summary judgment record—does not it itself create § 1983 liability. *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (citing *Duffield v. Jackson*, 545 F.3d 1234, 1239 (10th Cir. 2008)). "Rather, there must be 'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal

participation, his exercise of control or direction, or his failure to supervise.'" *Id.* (quoting *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997) (alterations in original)). To establish supervisory liability, a plaintiff must demonstrate: "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds*, 614 F.3d at 1199–1200 (citing *Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002)). For example, the Tenth Circuit has found that where a plaintiff came forward with evidence that "Oklahoma law made [the sheriff] responsible for the policies that operated and were enforced by his subordinates at the jail[,]" and where the sheriff admitted that such policies, which caused the plaintiff's constitutional injury, were still operational, the plaintiff had sufficient evidence to show that the sheriff "may have deliberately enforced or actively maintained the policies in question . . . ." *Id.* at 1203–1204.

Plaintiff has not offered a shred of evidence that provides a "factual basis to support an 'affirmative link' between these defendants and any alleged constitutional violation." *Gallagher*, 587 F.3d at 1069. As explained above, Plaintiff's evidence is insufficient to demonstrate a policy or custom that caused the alleged constitutional violation, and there is nothing in the summary judgment record that speaks to Defendants' state of mind. *See Dodds*, 614 F.3d at 1199. Plaintiff's claim for supervisory liability presents no genuine issue of material fact and Defendants are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

## V.     Conclusion

Plaintiff's motion for partial summary judgment is denied. With respect to Defendants' motion for summary judgment, the Court finds the following:

Count I: There are genuine issues of material fact about whether Defendant Hensley is entitled to qualified immunity with respect to Plaintiff's claim of unlawful arrest in violation of the Fourth Amendment, and Defendants' motion is denied as to the first part of Count I. Defendant Hensley is entitled to qualified immunity with respect to Plaintiff's claims of unlawful charging, unreasonable seizure, and excessive force in violation of the Fourth Amendment, and Defendants' motion is granted as to those portions of Count I.

Count II: Defendants are entitled to qualified immunity with respect to Plaintiff's claim that Defendants violated his due process rights under the Fourteenth Amendment. Defendants' motion is granted with respect to Count II.

Counts III and IV: Plaintiff has failed to meet his burden to show that he is a qualified individual with a disability, and so his claims under the ADA fail as a matter of law. Defendants' motion is granted with respect to Counts III and IV.

Count V: Plaintiff has met his burden to show that there is a genuine issue of fact with respect to his claim under the New Mexico Tort Claims Act against Defendant Hensley for battery and false imprisonment. The parties did not fully brief the issue regarding a violation under Article II, Section 10 of the New Mexico Constitution. Defendants' motion is denied as to these two parts of Count V.

Plaintiff has failed to meet his burden to show that there is a genuine issue of fact with respect to his claim under the Tort Claims Act against the remaining Defendants for negligent training and supervision, and his claim that Defendants' actions violated the New Mexico Children's Code. Defendants' motion is granted as to these two parts of Count V.

Count VI: Plaintiff has failed to meet his burden to show that there is a genuine issue of fact with respect to his claim under Article II, Section 18 of the New Mexico Constitution. Defendants' motion is granted with respect to Count VI.

Count VII: Plaintiff fails to state a municipal or supervisory liability claim, and Defendants' motion is granted with respect to Count VII

**THEREFORE,**

**IT IS ORDERED** that Paul Castaneda's Motion for Partial Summary Judgment on Count I of His Complaint: Unlawful Arrest, Unlawful Charging, Unreasonable Seizure, and Excessive Force (Doc. 64) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Including Qualified Immunity) and Memorandum of Law in Support (Doc. 62) is **GRANTED** as to Plaintiff's claims for unlawful charging, unreasonable seizure, and excessive force in violation of the Fourth Amendment, for a violation of his due process rights under the Fourteenth Amendment, under the ADA and the New Mexico Children's Code, under the Tort Claims Act for negligent training and supervision, and under § 1983 for negligent training and supervision.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Including Qualified Immunity) and Memorandum of Law in Support (Doc. 62) is **OTHERWISE DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**